# UNITED STATES DISTRICT COURT

**SEALED**

for the

Eastern District of Louisiana

| | |
|---|---|
| In the Matter of the Search of | ) |
| THE PREMISES KNOWN AS | ) |
| 3207 BELMONT PLACE, APARTMENT 102, | )    Case No.  24-mc-594 |
| METAIRIE, LOUISIANA, 70002 | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Eastern_____ District of _____Louisiana_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B)    Possession, receipt, and distribution of child sexual abuse material (CSAM)

The application is based on these facts: See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*/s/Jade Cohen*
*Applicant's signature*

Special Agent Jade Cohen
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone conference_____ *(specify reliable electronic means)*.

Date: ____March 11, 2024____

_____
*Judge's signature*

City and state: New Orleans, LA

Hon. Janis vanMeerveld, U.S. Magistrate Judge
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR A SEARCH WARRANT FOR THE PREMISES KNOWN AS 3207 BELMONT PLACE, APARTMENT 102, METAIRIE, LOUISIANA,70002 | Search Warrant No.: 24-mc-594<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Jade Raisa Cohen, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search: 3207 Belmont Place, Apartment 102, Metairie, LA 70002 (hereinafter "PREMISES").

2.       I have been employed since June 2023 as a Special Agent by the United States Department of Justice, Federal Bureau of Investigation ("FBI"). I am currently assigned to the New Orleans Field Office. My employment has vested me with the authority to conduct investigations, make arrests, and seize property for violations of federal laws, including Title 18, United States Code, Section 2252. I am currently assigned to investigate violent crimes against children as they affect the New Orleans area. In joining the FBI as a Special Agent, I initially received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.

**PURPOSE OF AFFIDAVIT**

3.       Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 2252(a)(2) (receipt and distribution of child sexual abuse material), 2252(a)(4)(B) (possession of child sexual abuse material) has been committed, are being committed, and/or will be committed by KEVIN LILLIS. There is also probable cause

to search the location described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

4.     This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary for the limited purpose of establishing probable cause to conduct a search of PREMISES for the evidence, contraband, and/or instrumentalities of the criminal conduct described herein. Additionally, unless otherwise indicated, wherever in this Affidavit I assert that an individual made a statement, that statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, unless otherwise indicated, all statements contained in this Affidavit are summaries in substance and in part. The following is true to the best of my knowledge and belief.

## **PROBABLE CAUSE**

5.     FBI agents in the Honolulu Field Office were involved in an investigation concerning a Honolulu, Hawaii resident ("Subject 1") suspected of distributing and receiving electronic files depicting the sexual exploitation of children via electronic means, including an end-to-end encrypted messaging platform headquartered in Sweden named "Wire." During the course of the investigation, an arrest warrant for Subject 1 and a federal search warrant for Subject 1's electronic devices were issued. During a custodial interview, Subject 1 gave FBI agents consent to use Subject 1's online identity on the platforms Wickr and Wire. In reviewing Subject 1's historical chats with Wire users, FBI agents identified multiple users distributing and receiving electronic files depicting the sexual exploitation of children.

6.    During the search of accounts obtained from Subject 1 via a lawfully issued search warrant, agents identified a chat between Subject 1 and a Wire user whose username was "exploringneeds." The chat between Subject 1 and "exploringneeds" began on about March 2023 and continued until about May 2023.

7.    For example, on approximately March 24, 2023, Subject 1 and "exploringneeds" discussed the sexual activities Subject 1 has engaged in with Subject 1's daughter. After describing how Subject 1's daughter did not like the taste of semen, "exploringneeds" responded "Have you tasted her pussy yet? I love the taste of pussy and it does change with age. I've always wanted to taste first menstruation."

8.    User "exploringneeds" also communicated in a group chat on Wire named "Moon Group" where "exploringneeds" communicated with other Wire users. The participants in "Moon Group" shared content related to the production, advertisement and distribution of electronic files depicting child sexual abuse material ("CSAM").

9.    For example, on about October 30, 2023, "exploringneeds" distributed five images in "Moon Group" depicting the sexual exploitation of children. Of those five images, one depicts an unclothed prepubescent female, approximately 7-8 years of age, being penetrated vaginally by an adult male penis.

10.    Additionally, a review of Subject 1's cellular phone, which was seized and searched through the execution of a lawfully issued search warrant, revealed evidence that on Friday, October 27, 2023, user "exploringneeds" shared 30 CSAM images via group chat "Moon Group." Specifically, user "exploringneeds" distributed the following representative files, among others, which I have personally reviewed:

a.    An image depicting a prepubescent female, approximately 7-8 years of age, kneeling down next to a bed with an adult male laying on the bed. The image shows the juvenile holding the adult male's penis in the juvenile's hand.

    b.   An image depicting an unclothed prepubescent female, approximately 7-8 years of age kneeling down with two adults, one male, one female, performing sexual acts on the juvenile. Namely, that the male is inserting his penis inside the juvenile's mouth while the female is inserting her tongue inside the juvenile's genitalia.

    c.   An image depicting an unclothed prepubescent female, approximately 5-6 years of age lying face down on a bed. The image focused on the juvenile's genitals and anus. The image had a caption that stated, "WHAT ARE YOU WAITING FOR?? RAPE THAT LITTLE CUNT!"

11.    On October 6, 2023, the Federal Office of Police of Sweden responded to a bulk request from FBI Honolulu for users, including user "exploringneeds," FBI Honolulu agents identified as sharing CSAM and being active in multiple groups that trade CSAM.

12.    The response from Swedish authorities included information that assisted in identifying user "exploringneeds."  For example, it included a Push token, which is a unique, alphanumeric string that allows a mobile application to communicate with the underlying user's mobile device.  It also indicated that the email account used to create Wire user name "exploringneeds" was "sorenvlikar@gmail.com."

13.    On October 18, 2023, an order pursuant to Title 18, United States Code, Section 2703(d) was served on Google seeking certain information regarding the Gmail account associated with Wire user "exploringneeds" (*i.e.*, sorenvlikar@gmail.com).

14.    In response to the 2703(d) Order, Google provided the following information relating to the email sorenvlikar@gmail.com:

    a.   Name: soren Vlikar

    b.   Given Name: soren

    c.   Family Name: Vlikar

    d.   Email: sorenvlikar@gmail.com

    e.   Recovery Email:  rooftop.rosetti@gmail.com

    f.   Associated accounts: battlehealercrius@gmail.com,

        facebookkev1313@gmail.com, kevinscosmiccreations@gmail.com,

        steelwing1313@gmail.com, rooftop.rosetti@gmail.com,

        kevinlillis1313@gmail.com, hpoba51retail@gmail.com.

15.    The data production provided by Google also included IP addresses from which user "exploringneeds" logged into the Gmail account sorenvlikar@gmail.com. Open source queries revealed that all the IP addresses were hosted by AT&T and resolved to Metairie, Louisiana.

16.    On January 16, 2024, in response to legal process, AT&T provided the following relevant information for one of the IP addresses from which user "exploringneeds" logged into the Gmail account sorenvlikar@gmail.com on or about October 15 – 17, 2023, 2600:1702:1b60:c2f0:478:9c69:9445:c23:

    a.   Customer: Kevin LILLIS

    b.   Service Address: PREMISES

17.    Open source queries for the Gmail addresses Google identified as being associated with the user "exploringneeds" revealed that several of the accounts had the display name "KEVIN LILLIS."

18.    FBI agents then confirmed, through law enforcement database checks, that PREMISES is the address of record for LILLIS.

19.    State of Louisiana Office of Motor Vehicles provided the following picture for LILLIS:



20.    According to a website that appears to be hosted by LILLIS, Kevin's Cosmic Creations, LILLIS works from home as a self-employed artist. LILLS has been known to sell his paintings online and at art fairs.

21.    According to posts made by user "exploringneeds" in a social media chatroom, he also enjoys seasonal employment as a Santa Claus impersonator:



22.    On February 6, 2024, an FBI special agent conducted physical surveillance at PREMISES. The agent conducting surveillance observed a white male, matching the description and photo of LILLIS, exit the apartment and then return approximately two hours later.

23.    A pole camera was also set up to view PREMISES to establish pattern of life for LILLIS. Based on the information from the pole camera and my training and experience, it is probable that LILLIS works from the PREMISES. Because LILLIS resides at the PREMISES, as well as because he appears to work from the PREMISES, probable cause exists that there are multiple electronic devices in the apartment that LILLIS uses regularly.

## CSAM COLLECTOR CHARACTERISTICS

24.    Based on my training and experience, I know that individuals who possess, transport, or distribute CSAM nearly always have an overriding sexual interest in minors.

25.    As evidenced in his/her written messages with other users on Wire, LILLIS has engaged in the distribution of CSAM with other users online, and there is probable cause to believe he possesses these materials on his digital devices. For persons with a sexual interest in minors, such as LILLIS, it is almost certain that their sexual arousal patterns and erotic imagery focus, in part or in whole, is on children.

26.    Based on my training and experience, individuals who collect, view, or possess child pornography tend to engage in the following patterns of behavior: collecting and organizing child pornography material; masturbating while viewing the child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; and/or interacting, both directly and indirectly, with other like-minded adults through membership in organizations catering to their sexual preference for children thereby providing a sense of acceptance and validation within a community. These are need-driven behaviors to which the offender is willing to devote considerable time, money, and energy.

27.    Based on my training and experience, individuals who collect, view, or possess child pornography, like LILLIS, almost always maintain and possess this material in the privacy and security of their homes, or some other secure location where it is readily available. Because a collection of CSAM can reveal the otherwise private sexual desires and intent of the collector, the collector may not dispose of the collection. The collection may be culled and refined over time, but the size of the collection tends to increase. The collection may be a prized possession. The evidence in this case suggests LILLIS was obtaining child pornography materials on the internet by trading certain images and videos for other images and videos, such as through the Wire chatting group. This increases the likelihood that LILLIS possesses a collection of child pornography, likely in his digital devices. Individuals who use a collection often treat the materials as prized possessions and are especially unlikely to part with them.

Even if a child pornography collector does delete files from his devices or other electronic media, a computer expert can possibly still retrieve those files using forensic tools.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

28.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29.    *Probable cause*. I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task; however, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

30.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the

storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage

media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know that when an individual uses a computer to possess, receive, or distribute CSAM, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

31.    *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its

data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

32.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BACKGROUND REGARDING ISP AND IP ADDRESSES

33.    I have had training and currently investigate crimes involving the sexual exploitation of children. Based on this training and knowledge, and the experience of other law enforcement personnel involved in this investigation, I know the following:

    a.   The Internet is a worldwide computer network that connects computers and allows communications and the transfer of data and information across state and national boundaries. A user accesses the Internet from a computer network or Internet Service Provider ("ISP") that connects to the Internet. The ISP assigns each user an Internet Protocol ("IP") Address. Each IP address is unique. Every computer or device on the Internet is referenced by a unique IP address the same way every telephone has a unique telephone number. An IP address is a series

of four numbers separated by a period, and each number is a whole number between 0 and 255. An example of an IP address is 192.168.10.102.

b. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. The ISP logs the date, time, and duration, of the Internet session from these records, depending on the ISP's record retention policies.

### REQUEST TO COLLECT BIOMETRIC DATA
### TO UNLOCK ELECTRONIC DEVICES

34.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

35.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

36.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

37.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

38.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

39.     As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law

enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

40.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

41.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at LILLIS' PREMISES

and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

42.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the LILLIS' PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device and any application that may be used to trade child pornography, such as Wire, in order to search its contents as authorized by this warrant.

## **CONCLUSION**

43.    Based upon the above information, I believe probable cause exists that there have been one or more violations of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B), which prohibit, among other things, the possession, receipt, and distribution, of depictions of minors engaged in sexually explicit conduct.

44.    Further, I believe that this evidence will be found at PREMISES, as computer equipment and peripherals, and other items listed in **Attachment B**. **Attachment A** is attached to this affidavit and is incorporated by reference as if fully set forth herein. In consideration of the foregoing, your Affiant respectfully requests that this Court issue a search warrant for 3207 Belmont Place, Apartment 102, Metairie, Louisiana, 70002, authorizing the search of said

address for the items described in **Attachment B**, and the seizure of such items for the purpose of searching and analyzing them off-site as set forth above.

Respectfully submitted,

*/s/Jade Cohen*_____
Jade Cohen
Special Agent
Federal Bureau of Investigation

*Pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3), the undersigned judicial officer has on this date considered the information communicated by reliable electronic means in considering whether a warrant will issue. In doing so, I have placed the affiant under oath, and the affiant has confirmed that the signature on the affidavit is that of the affiant, that the document received by me is a correct and complete copy of the document submitted by the affiant, and that the information contained in affidavit is true and correct to the best of the affiant's knowledge.*

Subscribed and sworn to me telephonically, this ___11th___ day of March, 2024.
New Orleans, Louisiana.

HONORABLE JANIS VAN MEERVELD
UNITED STATES MAGISTRATE JUDGE

**<u>ATTACHMENT A</u>**

**Location To Be Searched**

3207 Belmont Place, Apartment 102, Metairie, Louisiana, 70002 is an apartment in an apartment complex by the name of "Ante Bellum Apartments." It is located on the first floor of the two-story complex. The apartment complex is located on the south end of the street next to an open-air shopping complex. The apartment building is white and brick and surrounded by a black iron fence. Each apartment in the complex has a sliding glass door that faces out onto the street. To enter the apartments, there is a hallway leading to an internal courtyard where the doors face. There is a parking lot for residents on the north side of the apartment building with a separate hallway leading into the internal courtyard.









**ATTACHMENT B**

**Items To Be Searched and Seized**

This affidavit is in support of application for a warrant to search the premises known as 3207 Belmont Place, Apartment 102, Metairie, Louisiana, 70002, which is more specifically identified in the body of the application and in **Attachment A**, including, but not limited to, any computers, associated storage devices and/or other devices located therein that can be used to store information and/or connect to the Internet, for records and materials evidencing violations of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B), which criminalize, in part, the possession, receipt, and transmission of CSAM (defined in 18 U.S.C. § 2256), the violations involving LILLIS and occurring since approximately March, 2023, as more specifically identified below:

1.  Any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, routers, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPG), and any electronic data storage devices including, but not limited to hard ware, software, diskettes, backup tapes, CDROMS, DVD, Flash memory devices and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices, and related documentation, and any hardware/software manuals related to or used to: visually depict CSAM; contain information pertaining to the interest in CSAM; and/or

distribute, receive, or possess CSAM, or information pertaining to an interest in CSAM, or information pertaining to an interest in CSAM;

2.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

3.      Any and all visual depictions of minors.

4.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P software.

5.      CSAM in any form, including, but not limited to, the following:

a.   books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

b.   originals, copies, and negatives of visual depictions of minors engages in sexually explicit conduct as defined in 18 U.S.C. § 2256; and

c.   motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

6.      Information or correspondence pertaining to the possession, receipt, distribution, production, or attempted possession, receipt, distribution, or production of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail, including, but not limited to:

a.   Any and all notes, documents, records, or correspondence, in any format and medium, including, but not limited to, envelopes, letters, electronic mail, internet identities or screen names, chat logs, and electronic messages,

pertaining to the possession, receipt, access to, or transmission through interstate or foreign commerce, including by U.S. mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by U.S. mail or by computer of any visual depiction of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256; Records evidencing occupancy or ownership of the premises described above including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence; and Records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for internet access, and handwritten notes.

7.    All other records and materials relating to violations of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B).

8.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored 4 records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    m.  contextual information necessary to understand the evidence described in this attachment.

9.    Routers, modems, and network equipment used to connect computers to the Internet. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

**Authority to Collect Biometric Data**

During the execution of the search of the Subject Premises and the Subject described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of a device found at the Subject Premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.